# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### VALDOSTA DIVISION

DR. WILLIAM LEAMON MADISON,

    *Plaintiff*,

v.

COLQUITT COUNTY SCHOOL DISTRICT;
ROBBY PITTS,
*in his individual and official capacity*;
MARY BETH WATSON,
*in her individual and official capacity*;
PAT ANDERSON,
*in her individual and official capacity*;
TRUDIE HILL,
*in her individual and official capacity*;
DOUG HOWELL,
*in his individual and official capacity*;
JON SCHWALLS,
*in his individual and official capacity*;
and
KEVIN SUMNER,
*in his individual and official capacity*;

    *Defendants*.

Civil Action No.


JURY TRIAL DEMANDED

## COMPLAINT

COMES NOW Plaintiff, Dr. William Leamon Madison, and files this

Complaint against the Defendants showing the Court as follows:

### INTRODUCTION

Dr. William Leamon Madison was a hometown hero in Colquitt County,

1

graduating from Colquitt County Schools as a football athlete, then working his way up for nearly two decades within the school system from a paraprofessional all the way to elementary school principal. For nearly two decades, Dr. Madison received stellar job evaluations until he spoke out against race discrimination where he was subjected to a hostile work environment and explicit discrimination. Dr. Madison was threatened with lynching and reported this hate crime. Three days after reporting the lynching threat, the Colquitt County Board of Education voted to non-renew Dr. Madison's contract.

## 1.

This is a civil rights action for damages and injunctive relief arising out of workplace conduct caused and perpetuated by the Colquitt County School District, members of the Colquitt County Board of Education, and the School District's former Superintendent, Mr. Doug Howell, in violation of Dr. Madison's rights under the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the Equal Protection Clause of the 14th Amendment to the Constitution of the United States in addition to state claims of defamation and violations of the Georgia Open Records Act.

## 2.

Dr. Madison seeks redress for racially motivated conduct perpetrated upon him. A Charge of Discrimination is pending determination by the U.S. Equal Employment Opportunity Commission. (*See* Exhibit A.) Dr. Madison's rights

under the Civil Rights Act of 1866, 42 U.S.C. § 1981, including the same right to make and enforce contracts and to the full and equal benefit of all laws and proceedings as is enjoyed by white citizens, and his rights under the Equal Protection Clause of the 14th Amendment to the Constitution of the United States, have been violated. In violating Dr. Madison's rights, Defendants have caused him substantial financial and emotional harm.

## JURISDICTION AND VENUE

3.

Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights) because the matters in controversy arise under the laws of the United States, to wit, the Civil Rights Act of 1866, 42 U.S.C. § 1981, the Equal Protection Clause of the 14th Amendment to the Constitution of the United States, and 42 U.S.C. § 1983.

4.

Venue is proper in this Court under 28 U.S.C. § 1391 because it is a district where Defendants reside or do business and where a substantial part of the events giving rise to Dr. Madison's claims occurred.

5.

All conditions precedent to jurisdiction under the Civil Rights Act of 1866 have occurred.

## PARTIES

6.

Plaintiff Dr. William Leamon Madison is an African American resident of Colquitt County, Georgia.

7.

Defendant Colquitt County School District (also referred to as Colquitt County Schools) is organized and existing under the laws of the State of Georgia can be served with the Summons and Complaint by serving the present Superintendent, Mr. Ben Wiggins, at 710 Lane Street, Moultrie, Georgia 31768.

8.

Defendant Robby Pitts was a member of the Colquitt County Board of Education at all times material to this action. Defendant is a resident of Colquitt County and can be served with the Summons and Complaint as provided by law.

9.

Defendant Mary Beth Watson was a member of the Colquitt County Board of Education at all times material to this action and remains to the present day. Defendant is a resident of Colquitt County and can be served with the Summons and Complaint as provided by law.

10.

Defendant Pat Anderson was a member of the Colquitt County Board of Education at all times material to this action. Defendant is a resident of Colquitt County and can be served with the Summons and Complaint as provided by law.

11.

Defendant Trudie Hill was a member of the Colquitt County Board of Education at all times material to this action and remains to the present day. Defendant is a resident of Colquitt County and can be served with the Summons and Complaint as provided by law.

12.

Defendant Doug Howell was Superintendent of the Colquitt County School District at all times material to this action. Defendant is a resident of Colquitt County and can be served with the Summons and Complaint as provided by law.

13.

Defendant Jon Schwalls was a member of the Colquitt County Board of Education at all times material to this action and remains to the present day. Defendant is a resident of Colquitt County and can be served with the Summons and Complaint as provided by law.

14.

Defendant Kevin Sumner was a member of the Colquitt County Board of Education at all times material to this action and remains to the present day. Defendant is a resident of Colquitt County and can be served with the Summons and Complaint as provided by law.

## STATEMENT OF FACTS

15.

Dr. William Leamon Madison is an accomplished African American educator who was born and raised in Colquitt County Schools, graduating from high school as a beloved football athlete. He devoted his entire life and entire professional career to Colquitt County Schools, starting as a paraprofessional, obtaining his Doctorate, and working his way up to Principal.

16.

Dr. Madison began working for Colquitt County School District nineteen years ago (2004): first as a paraprofessional, then as a teacher, and then going into administration.

17.

For his seventeen years at Colquitt County Schools, Dr. Madison always received stellar end of year satisfactory work performance evaluations.

18.

It wasn't until after Dr. Madison sent out emails to faculty members, condemning the murder of George Floyd and race discrimination during the 2020-2021 school year, that he became subjected to overt retaliation and a hostile work environment leading to threats of lynching and termination.

## STATEMENT OF FACTS

### HISTORICAL SIGNIFICANCE OF COLQUITT COUNTY SCHOOL DISTRICT'S RACIALLY DISCRIMINATORY TREATMENT

*What is happening is not integration; rather it is disintegration—the near total disintegration of Black authority in every area of the system of public education. —National Educational Association[1].*

19.

Colquitt County School District did not willingly go along with the United States Supreme Court's Order to desegregate in *Brown v Topeka Board of Education*. On August 1, 1969, the United States had to sue the State of Georgia alleging violations of federal law for failure of school districts, like Colquitt County, to desegregate. *United States v. State of Georgia*, C.A. No. 12,972 (N.D.Ga.). Courageous African Americans seeking to enforce desegregation in Colquitt County were represented by the famous civil rights leader and attorney C.B. King[2] and former civil rights attorney, current sitting Court of Appeals Judge

---

[1] https://www.politico.com/news/magazine/2022/05/17/brown-board-education-downside-00032799
[2] https://en.wikipedia.org/wiki/Chevene_Bowers_King

Herbert Phipps in the suit against the Colquitt County School Board. *Wilma Joyce Harrington et al v. Colquitt Cnty. Bd. of Ed.*, 460 F.2d 193, 194 (5th Cir. 1972.)

20.

Because of widespread pervasive racial discrimination within Colquitt County and throughout the south, the result of enforcing *Brown* has "had an unintended consequence, the effects of which are still felt today: It caused the dismissal, demotion, or forced resignation of many experienced, highly credentialed black educators who staffed black-only schools. After the decision, tens of thousands of black educators lost their jobs as white superintendents began to integrate schools but balked at putting black educators in positions of authority over white teachers or students."[3]

21.

Disintegration, rather than integration, of Black public educational leadership was set in motion and Black educators *to date* are ongoingly "purged from public schools in southern and border states" starting with decades of "White resistance to the *Brown* decision...[This] expulsion of Black principals and teachers [is] not exclusively a loss to Blacks and the South; it represented the most significant brain drain from the US public education system that the nation has ever seen. It was so pervasive and destabilizing that, even a half-century later, the

---

[3] https://www.edweek.org/policy-politics/65-years-after-brown-v-board-where-are-all-the-black-educators/2019/05

nation's public schools still have not recovered." LESLIE T. FENWICK, JIM CROW'S PINK SLIP: THE UNTOLD STORY OF BLACK PRINCIPAL AND TEACHER LEADERSHIP, xxiii, Harvard Ed. Press (2022). "Massive White resistance to the *Brown v Topeka Board of Education* decision prompted the firings, demotions, and dismissals of legions of highly credentialed and effective Black principals and teachers. The fight to decimate the ranks of Black educators was so pervasive and severe that its fallout eventually reached the ears of Congress." FENWICK, at 3.

22.

In 1971, the US Senate Select Committee on Equal Education Opportunity held a series of hearings about the displacement and status of Black school principals in desegregated schools as a result of "NAACP's and other civil and human rights organizations' presence, reach and advocacy" at the time in Washington D.C. FENWICK, at 3. The data was well documented in the transcript *Hearings before the Select Committee on Equal Educational Opportunity of the U.S. Senate on the Displacement and Present Status of Black School Principals in Desegregating School Districts* along with the numerous books and scholarly articles written about the tragic firings and demotions that have befell Black teachers and principals as a result. FENWICK, at xvi. "As testimony at the hearings confirmed, 'resistance to the prospect of Black principals supervising white teachers or of Black teachers for white students remains firmly entrenched in

southern White communities. As a result, Black educators are being dismissed, removed, or phased out.'" FENWICK, at 10. In the words of a United States Department of Education commissioner, this displacement was "delimiting the ranks of Black teachers and threatening Black principals with extinction." FENWICK, at 11.

23.

"By the late 1970's White resistance—or rather, White racism—had systematically and ruthlessly decimated the ranks of Black principals and teachers…in this annihilation the nation lost at least 100,000 Black principals and teachers." FENWICK, at 129. As Black student enrollment grew, the Black principal and teacher pipeline of exceptionally credentialed Black educators fell dramatically. FENWICK, at 2. In contrast, white educator appointments thrived, even as white student enrollment declined due to white flight. FENWICK, at 2.

24.

Black educator displacement was widespread across the southern states: "Georgia had 7,687 Black teachers in 1968 and decreased that number by 526. During that same time period, the state had 22,943 white teachers and increased their ranks by 1,086." FENWICK, at 15. Oftentimes, the Black educators who resisted illegal firings were subjected to an extraordinary range of reprisals including physical threats of violence; demotion, out of subject placement, and

"promotion" (i.e., sidelining) to head district based federally funded programs like Title I where they could easily be dismissed once the funding ran out. FENWICK, at 16-17. Decades after *Brown* became law of the land, "White school boards, superintendents, and citizens, purposely resisted the new law of the land, often going to extremes to maintain and perpetuate White control of the nation's public schools." FENWICK, at 122. In fact, when Blacks were removed from principalship and replaced by Whites, Black teachers and students suffered the same fate according to a NEA report "submersion of their interest and identities" and decimation of "every symbol of Black identity." FENWICK, at 124.

25.

Dr. Benjamin E. Mays, the iconic civil rights leader who was a mentor to Dr. Martin Luther King, Jr., president of Morehouse College, and an Atlanta Public Schools Board Member, "characterized the annihilation of Black principals and teachers as traumatic. The trauma that resulted from White racist resistance to Brown was at least fourfold: a decline in the economic and political power of southern Blacks; a reduction in the caliber of public school leadership for the south; a dampening of the professional aspirations of Black educators; and measurable harm to the intellectual and social development and wellbeing of Black youth." FENWICK, at 131.

26.

The fallout of this decimation of Black principals and teachers hits Black students the hardest, as studies have shown that Black students with higher percentages of Black educational leaders are more likely to graduate; more likely to be tested for gifted; less likely to be misplaced in special education; more likely to engage in positive school behaviors; more likely to be described as intellectually capable; are less likely to be suspended or expelled; have higher expectations for academic success; achieve more beneficial outcomes in reading, testing, attendance, and college matriculation FENWICK, at 140.

27.

For students in the Colquitt County community and beyond "the loss of Black principals and teachers" is "keenly felt by Black students who often found themselves in unwelcoming and hostile new surroundings. Their intellectual models, guides, protectors, and encouragers…. [t]he ones who would model and teach them how to negotiate a racist world [are] gone." FENWICK, at 144. And, most insidiously, it continues to date, where in the year 2022 Black educators are terminated, demoted, and denied equal employment opportunities throughout our state of Georgia as a result of continued racial discrimination. Prior to *Brown*, principals and teachers who composed nearly fifty percent of the education workforce were Black, nearly seventy years later to date, no state begins to

approach those percentages. FENWICK, at 137. According to the National Center for Education Statistics (NCES) study published in 2020, the nation's schools have "93,200 principals, only 11 percent of them are Black. Of the nation's 3.2 million teachers, only 7 percent of Black. Fewer than 3 percent of the nation's 13,800 school districts are led by Black superintendents." FENWICK, at 138. These low numbers exist even though Black principals and teachers, both then and now, are consistently the nation's most academically credentialed and experienced educators, more likely to hold a doctorate and have more years of professional experience compared to their white peers. FENWICK, at 138. Yet the ongoing discrimination of Black educators continues to inflict irreparable damage here in Georgia, where African American principals and educators, like Dr. Madison, continue to be terminated, demoted, and denied equal employment opportunities as a result of continued racial discrimination.

28.

Dr. Madison served as a Principal in the Colquitt County School District from 2018 to Spring 2021, and as an Assistant Principal for eight years prior to that starting in 2010.

29.

Dr. Madison grew up as a hometown son of Colquitt County Schools, a former high school football athlete who worked his way up for nearly two decades within the school system from paraprofessional to elementary school principal.

30.

Dr. Madison obtained praise for his job for seventeen years until he spoke out against the murders of African Americans and against racial discrimination.

## THE RACIAL DISCRIMINATION THAT PLAINTIFF DR. WILLIAM LEAMON MADISON SPOKE OUT AGAINST

31.

On February 23, 2020, a young Black man named Ahmaud Arbery was murdered while jogging in south Georgia[4]. All three of his killers were convicted of murder in a state jury trial along with a federal trial prosecuted by the U.S. DOJ, receiving lengthy prison sentences including two who were put away for life. Some of the evidence that came forth at trial included text messages they had exchanged containing racial slurs, as well as racist posts on social media, and the actual video of the murder that had been caught on one of the defendant's cell phone. One cell phone record showed that one of Mr. Arbery's murderers had exchanged sixteen phone calls with the Glynn County District Attorney shortly after his killing, one

---

[4]https://www.ajc.com/news/ahmaud-arbery-shooting-investigation/;
https://en.wikipedia.org/wiki/Murder_of_Ahmaud_Arbery

that lasted over twenty-one minutes.[5] This would later lead to the District Attorney's arrest and indictment for violating her oath as a public officer.

32.

One month after Mr. Arbery was murdered while jogging, Breanna Taylor, a 26-year-old Black emergency medical technician was minding her business at home when she was fatally shot by three police officers in Louisville, Kentucky on March 13, 2020. These officers were charged by the U.S. DOJ[6].

33.

On May 25, 2020, a mere two months after Ms. Taylor's murder and three months Mr. Arbery's murder, a Black man named George Floyd, who had been arrested on the suspicion he had used a counterfeit $20 bill, was murdered in the city of Minneapolis by a white police officer who knelt on his neck for over nine minutes.[7] Mr. Floyd's murderer remained on his neck the entire nine minutes despite him calling out for mercy and crying out to his dead mother in the final moments of his life as he struggled to breathe. This God-awful scene was caught on the ubiquitous piece of evidence in all of these cases—the cell phone. The white officer was sentenced in state court to twenty-two and a half years in prison and he and the other three officers who assisted him were all also convicted of federal

---

[5] https://www.wtoc.com/2022/05/05/ag-prosecutors-detail-their-case-against-former-brunswick-da/
[6] https://abcnews.go.com/US/doj-announces-charges-connection-raid-killed-breonna-taylor/story?id=87926113
[7] https://en.wikipedia.org/wiki/Murder_of_George_Floyd

civil rights crimes.

34.

It was the murders of Mr. Arbery, Ms. Taylor, and Mr. Floyd that caused worldwide protest and caused enormous distress to many Americans, but especially to Black people such as the young Black students who attend Colquitt County Schools and who had no way of knowing if they might be next. Consequently, Dr. Madison, an African American Principal and leader in the Colquitt County School System, was compelled to speak out against these murders and address fears that his Black students in South Georgia faced. This is an ever-present reality of racial discrimination that still, in 2023, is the legacy of slavery, Jim Crow, and the dismantling consequences of *Brown v. Board of Education* that still today, permeate public schools throughout our great state of Georgia.

35.

Approximately a week after George Floyd's murder, Dr. Madison sent an email on June 4, 2020, to the faculty and staff at Cox Elementary School:

> "Greetings Cox Family. I'm sure that you are all aware of what's currently going on across our nation. People from every walk of life are marching and protesting against police brutality toward people of color but more directly Black Unarmed Males. This phenomenon, if you will, is nothing new. This has been taking place for years, and had almost become so commonplace that it didn't seem to bother us as a city, state or nation. However, times are a changing, as they should! We as educators, charged with preparing the next generation of leaders have to ask ourselves, do we continue to turn a blind eye to such egregious societal matters as these? Do we intentionally avoid

16

conversations about such matters and not educate our students on how to properly conduct themselves when interacting with law enforcement, especially those that look like me, Mr. Nate or Mr. Taylor as they are usually the ones who could very well lose their lives from a routine traffic stop? Do we not educate all of our students on how egregious and heinous these acts are, and how they go against the very thing our flag and nation purports to stand for, which is liberty, equality and justice for all? Enough is enough, and we as educators, community leaders and God fearing people have to join forces and take a stand for what's right! It would be so hypocritical of us to continue to allow our black males in this great city, state and nation to be brutally attacked and killed by the very people who are charged with serving and protecting them while simultaneously teaching them that racism no longer exists and ignore the fact that black males (even unarmed) are attacked and killed at an extremely higher rate by police than any other race of males. I was proud to see our peaceful protestors on the courthouse square joining forces and standing up against these senseless acts of violence. I am proud of each and everyone of you and honored to be your leader here at Cox Elementary School. I would not be worthy of being your leader if I were not willing to address issues in our society that impacts us all as the educators of future leaders. Moreover, these issues could have an even greater impact on the majority of the students we teach which are black males. I always say that we are charged with teaching the whole child. Well, here's a perfect example of why it is so important. This is also a perfect opportunity for us as a school family to help equip our students with the tools that are sadly necessary to survive police encounters. We are the Standard for Student Achievement! We do Set the Stage for Success! And as we get ready to Roll out the Red Carpet for Success for our Celebrities, let's remember that we are charged with preparing them for life in the 21st Century. Sadly, in the 21st Century we are still battling with, dealing with and addressing racism. So let's ask ourselves, Are we going to stand idle and do nothing? Are we going to join the stance for what's right and to speak and act against racism? Are we going to be open and honest with our students and educate them on how horrendous these acts are? Are we going to be an active participant in the fight against racism, not only in words but in actions? I love you all and would go to battle for any of you! We are family and we are the C.O.X.! Remember, our students are counting on us to do the right thing. If we don't stand for something,

17

we will fall for anything! Let's be the difference in Colquitt County, Georgia and the world! Thank you for all you do!"

(*See* Exhibit B.)

36.

On July 4, 2020, Dr. Madison sent another email to faculty and staff as an educational tool concerning these issues of race. (*See* Exhibit C.)

37.

On July 17, 2020, he sent another email to faculty and staff encouraging them how to maintain an encouraging and positive learning environment for students returning back to school and learning how to cope with the social unrest that was occurring relating to issues of racism and discrimination. (*See* Exhibit D.)

38.

In response to these communications about race discrimination, Dr. Madison was subjected to much revulsion and retaliation by the District administration, in particular a white School Board candidate, Defendant Jon Schwalls, made false allegations against Dr. Madison including statements that he was "unqualified," "racist," "bigoted" and "incapable of leading."

39.

Defendant Schwalls seemingly made it his mission to go after Dr. Madison with a vengeance. Defendant Schwalls sent the entire Board in an email that became part of public records under the Georgia Open Records Act calling for the

*"immediate removal of Mr. Madison from his position of leadership"* while criticizing the emails Dr. Madison sent that spoke out against race discrimination and condemned the unjustified killings of Black people. (*See* Exhibit E.)

40.

After Defendant Schwalls became Board Member, he would continue going after Dr. Madison seeking his removal as Principal.

41.

In response to Defendant Schwalls,[8] then Superintendent Defendant Doug Howell met with Dr. Madison to discuss the "George Floyd email" and informed him that several Board of Education Members were upset by the email and calling for Dr. Madison's job.

42.

In response to Dr. Madison speaking out against race discrimination, Defendants engaged in making false statements against Dr. Madison including statements referring to his profession calculated to injure him.

43.

For the first time in his career, subsequent to writing the letter opposing discrimination, Dr. Madison received a letter from the Superintendent

---

[8]A white man whose highest level of educational degree is a high school diploma (Schwalls Dep. 14:21-22) yet was elected to the Board of Education where he sought to remove a Black principal with a doctorate from his job.

reprimanding him and criticizing his performance.

44.

For example, Defendant Howell, as Superintendent, drafted a letter of directive to Dr. Madison on March 25, 2021, filled with false accusations. Superintendent Howell then secretly placed the letter in Dr. Madison's personnel file to "pad the record" making it look as if he had given it to Dr. Madison when in fact Superintendent Howell intentionally kept Dr. Madison from seeing the letter, so he was unable to respond to the false allegations.

45.

Throughout the 2020-2021 school year, the retaliation continued against Dr. Madison as various white teachers became emboldened by the Board's discriminatory actions and directly spoke with Central Office administration and Board Members.

46.

A white teacher directly threatened Dr. Madison with lynching, a racist hate crime, by saying: "We're going to lynch you."

47.

On March 19, 2021, Dr. Madison, along with his Assistant Principal, Mindy Palmer, met with the teacher regarding the threat that she had made to his face where she had clearly told him: "we're going to lynch you."

48.

The teacher became very angry, denied it, and informed Dr. Madison and Ms. Palmer that she had been speaking to a Board of Education Member, the Assistant Superintendent of Human Resources, and Superintendent Howell who had instructed her to tape record him, making it clear to Dr. Madison that his employer was not taking his complaint of discrimination seriously, or the racist threat to his life.

49.

After reporting the threat of lynching to Defendants and complaining against race discrimination, approximately three days later the Board of Education decided to non-renew Dr. Madison as Principal on March 22, 2021.

50.

On March 29, 2021, Dr. Madison met with Assistant Superintendent of Human Resources James Harrell and Superintendent Doug Howell to discuss his non-renewal. It is at this meeting that Defendants first inform Dr. Madison that they are not giving him another position, i.e. demoting him to assistant principal or teacher, but that he is being terminated from employment permanently and that Memorial Day would be his last day.

51.

Retaliating against someone for speaking out against discrimination is in clear violation of Title VII of the Civil Rights Act of 1964 as well as 42 U.S.C.S. § 1981 as well as rights asserted in the Equal Protection Clause United States Constitution.

52.

Dr. Madison continued to work the remainder of the school year until May 28, 2021, all the while waiting for his official non-renewal letter and continuing to experience discrimination and retaliation.

53.

On Monday, April 12, 2021, Dr. Madison sent the following Open Records Request to Superintendent Howell:

To: James (Doug) Howell <james.howell@colquitt.k12.ga.us>

Dear Superintendent Doug Howell:

At our last meeting you told me to follow up with you if I have any questions and concerns regarding the Board's decision to not renew my contract. I am writing you to request such information. I cannot understand why just a few days after reporting a discriminatory complaint over a teacher who had made a threat against me--specifically stating that I would be lynched---that rather than receiving support from my school system, that the result would be to end my future employment.

This is disheartening and I am simply looking for answers. Would you be willing to meet with me to discuss this issue? Additionally, I am requesting you provide me Open Records that might provide me

insight into what I can only perceive as continued discriminatory treatment, conspiring efforts on behalf of some to cause me to lose my job and lack of support.

I respectfully request:

1. All documents and records-- including cell phone text messages and emails--exchanged to or from the Superintendent Doug Howell, HR Director James Harrell, Board members Mary Beth Watson, John Schwalls, Robbie Pitts, Teachers Ronda Tucker, Autumn Dickens, Rachel Crew, Marcie Tadlock, Brandi Curles, Aralee Smith, Lauren Stinson, Allison Creech, Nacole Knutson, Margaret Presley Allison Bivins, Selena Henry, Myra Hill concerning me, Dr. Leamon Madison.

2. All documents and records in support of the decision to non-renew me.

3. My complete personnel file.

4. All information related to the consent decree, consent order, unitary status, and the lawsuit U.S. v. State of Georgia, et al., C.A. No. 12972, between the U.S. Department of Justice, Office of Civil Rights, Department of Education and Colquitt County School District as well as documents pertaining to any school system accreditation (state or federal), especially in regards to the demographic makeup of the Colquitt County School System as it pertains to Blacks in teaching positions and positions of leadership.

Sincerely,
Dr. Leamon Madison

54.

The Open Records Act responses Dr. Madison received back from Defendant Colquitt County School District were incomplete and deficient, specifically as it related to request number one: cell phone text messages between

various Board Members, Superintendent Howell, and other District employees.

55.

Dr. Madison alerted Defendant Colquitt County School District of their deficiency in their response and the District, through their counsel, made clear that it did not produce such electronic messages sourced from the District employees' or Board Members' cell phones that would be responsive to such open records request as it was not in the possession of these District employees' or Board Members' cell phones.

56.

Nevertheless, Georgia public records that are subject to Open Records Act requests include electronic messages that are exchanged via cell phones of public employees and officials. O.C.G.A. § 50-18-71.

57.

Public officials routinely seek to evade the Georgia Open Records Act by exchanging electronic messages subject to public records requests on their personal cell phone devices and personal email accounts. However, the Attorney General for the State of Georgia has criminally prosecuted public employees who have evaded the Georgia Open Records Act that have included text messages on their cell phones and stated that he has hoped this will "encourage others to bring to light instances of open records abuses"…."If there are other instances out there and

the facts take us to where they took us in this trial then we are willing to stand up again for the people of Georgia," Chris Carr said.[9]

58.

Courts in fact have ordered Georgia Board of Education Members and Superintendents to submit their personal cell phone devices to computer forensic examination to search for racial slurs and derogatory terms against African Americans where they evaded Open Records Act requests by failing to produce text messages that were on their personal cell phones. (*See* Exhibits F, G.)

59.

Dr. Madison is entitled to obtain text messages that were exchanged to and from Board of Education Members and Superintendent Howell concerning his employment. As is the commonplace best practice in e-discovery when electronically stored information is sought, a party's counsel should not simply rely on an honesty policy which depends on potential 'bad actors' to produce potentially self-damning disclosures and allows them to evade it by simply producing an affidavit claiming such communications are not there. Rather, best practices require Parties utilize ESI vendors, electronic tools, and electronic search protocols and methodologies that will solely extract relevant, key word search terms from both personal computer and cell phone devices while maintaining the

---

[9] https://www.ajc.com/news/reed-aide-first-official-convicted-public-records-violations/ImqpLWZLh9aMU89t6vcwtI/

owner's privacy. E.g. The Sedona Conference, *Best Practices Commentary on the Use of Search and Information Retrieval Methods in E-Discovery,* 15 Sedona Conf. J. 217-263 (2014); *The Sedona Conference Commentary on Achieving Quality in the E-Discovery Process,* 15 Sedona Conf. J. 265-304 (2014); *Managing E-Discovery and ESI From Pre-Litigation Through Trial* 441 (Michael D. Berman, Courtney Ingraffia Barton, and Paul W. Grimm, eds., 2011); *United States v. O'Keefe*, 537 F. Supp. 2d 14 (D.D.C. 2008); *Equity Analytics, LLC v. Lundin*, 248 F.R.D. 331 (D.D.C 2008); *Victor Stanley, Inc. v. Creative Pip, Inc*., 250 F.R.D. 251, 262 (D. Md. 2008) (Compliance with the Sedona Conference Best Practices for use of search and information retrieval will go a long way towards convincing the court that the method chosen was reasonable and reliable.)

60.

Whether the information sought concerns a defendant corporation's work matter or a governmental entity's public records, the Courts routinely order defendants to produce their personal cell phones to be forensically imaged and then electronically searched for relevant discoverable evidence. (*See* Exhibits F, G.) All private and privileged information is carefully protected. An e-discovery company would only extract the relevant information and would identify what if any information was deleted. Then, before such information is produced to Plaintiff's Counsel, it would produce the documents to Defendants' Counsel for review and if

a privilege exception is claimed, the documents would be submitted to the Court for an in-camera inspection. (*E.g., see* Exhibits F, G.) Utilizing a third-party company is not a privacy violation but a standard best practice within e-discovery which establishes that "devising a defensible electronic search protocol…that includes quality checks and that is well supervised are central to a well-constructed search methodology, especially in the absence of cooperation with or by opposing counsel. Close supervision of the whole process is crucial." *Managing E-Discovery and ESI From Pre-Litigation Through Trial* 474-475 (Michael D. Berman, Courtney Ingraffia Barton, and Paul W. Grimm, eds., 2011) citing *The Sedona Conference Commentary on Achieving Quality in the E-Discovery Process,* 15 Sedona Conf. J. 265-304 (2014).

61.

Moreover, one of the important suggestions by the Sedona Conference, a non-profit group made up of judges and lawyers whose principles form the most authoritative guidelines for e-discovery to date, is that "independent testing by third party professionals" be done in order to be sure that data such as emails and text messages were "successfully extracted." *Id*. The aim of such a strategy is "not only to be prepared to defend the reasonableness of a search protocol" but "to assure quality control and quality assurance in the e-discovery context" because "the practical consequences of failing to institute quality checks on the process can

be severe" where the Courts have sanctioned parties and waived privilege "based on a party's failure to institute quality control sampling." *Id* at 476.

62.

To date, Defendant Colquitt County School District remains deficient in producing cell phone text messages exchanged between District employees including the Assistant Superintendent of Human Resources, Board of Education Members, and former Superintendent Howell concerning Dr. Madison.

63.

Dr. Madison currently has a Title VII Charge before the EEOC and reserves all rights he has to bring to bring a suit and to amend this complaint once a right to sue notice is issued.

**COUNT ONE**

**CIVIL RIGHTS ACTS OF 1866 – RETALIATION FOR OPPOSING RACIALLY DISCRIMINATORY EMPLOYMENT PRACTICES**
*Against all Defendants and concerning defendants sued in their individual capacity pursuant to 42. U.S.C. § 1983.*

64.

Plaintiff now fully incorporates the facts and assertions found in paragraphs 18,30, 34, 35-42, 43, 44-52, and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Count.

65.

Defendant Colquitt County School District, by and through its agents, as specified herein, knowingly, willfully, and intentionally discriminated against Dr. Madison, as described above and as further to be proved at trial, because he opposed racially discriminatory employment practices of the School District, as prohibited by 42 U.S.C. § 2000e-3(a) and 42 U.S.C. § 1981.

66.

The conduct of Defendant Colquitt County School District and its agents conduct in interfering with his professional development, denying him employment privileges, professional opportunities, career advances and promotions, and actions in ostracizing and harassing Dr. Madison, was because of his race and for the purpose of retaliating against him because of his opposition to its unlawful employment practices.

67.

In retaliating against Dr. Madison for his opposition to its unlawful employment practices, Defendants denied Dr. Madison the same right to make and enforce contracts, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, as described above and to be further proved at trial, because of his race, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

68.

Dr. Madison's opposition to Defendant Colquitt County School District's racially discriminatory employment practices was a significant and determining factor in the decision of Defendants to subject him to the described abusive retaliatory treatment, including without limitation terminating his employment.

69.

Any reasons given for denial of Dr. Madison's rights to make and enforce contracts and to the full and equal benefit of the laws are false and a pretext for the discriminatory retaliation motivating the Defendants' actions.

70.

The illegal actions of Defendants were committed intentionally and caused Dr. Madison significant financial loss and emotional distress.

71.

As a direct, legal, and proximate result of the Defendants' violations of Dr. Madison's legal rights, Dr. Madison has been injured in an amount to be proven at trial.

72.

The Defendants, acting under color of statute, ordinance, regulation, and with a policy, custom, or usage of allowing, abetting, and perpetrating racial discrimination, subjected Dr. Madison to, or caused him to be subjected to, the

deprivation of rights, privileges, or immunities secured by the Civil Rights Act of 1866, 42 U.S.C. § 1981, by and through 42 U.S.C. § 1983.

73.

Defendants are liable to Dr. Madison for all damages arising from their collective and individual conduct violating Dr. Madison's rights under the Civil Rights Act of 1866, 42 U.S.C. § 1981.

74.

Dr. Madison requests that the Court award damages and equitable relief against the Defendants for Dr. Madison in an amount to be determined by evidence offered at trial of this matter.

## COUNT TWO

### CIVIL RIGHTS ACT OF 1866 – DISPARATE TREATMENT
*Against all Defendants and against defendants in their individual capacity pursuant to 42. U.S.C. § 1983.*

75.

Plaintiff now fully incorporates the facts and assertions found in paragraphs 18, 30, 35-42, 43, 44-52, and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Count.

76.

Dr. Madison was harassed, discriminated, and denied equal opportunity in employment privileges, career advancement, hiring, and promotions whereas his

Caucasian counterparts also employed by Defendant Colquitt County School District were not discriminated and denied such privileges.

77.

In particular, Dr. Madison's white co-workers have been given opportunities for professional advancement, employment privileges, career advancement and job promotion while Dr. Madison was denied such opportunities.

78.

The actions and inaction of the Defendants in harassing Dr. Madison, denying him professional advancement, employment privileges, career advancement and job promotion of similarly situated white co-workers denied him the rights enjoyed by his white counterparts to make and enforce his contract of employment and to have the full and equal benefit of all laws as is enjoyed by white citizens, as described above and to be further proved at trial, because of his race in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

79.

The actions of Defendants were committed intentionally and caused Dr. Madison significant financial loss and emotional distress.

80.

As a direct, legal, and proximate result of the Defendants' violations of Dr. Madison's legal rights, Dr. Madison has been injured in an amount to be proven at trial.

81.

Defendants, acting under color of statute, ordinance, regulation, and with a policy, custom, or usage of allowing, abetting, and perpetrating racial discrimination, subjected Dr. Madison to, or caused him to be subjected to, the deprivation of rights, privileges, or immunities secured by the Civil Rights Act of 1866, 42 U.S.C. § 1981, by and through 42 U.S.C. § 1983.

82.

Defendants are liable to Dr. Madison for all damages arising from their collective and individual conduct violating Dr. Madison's rights under the Civil Rights Act of 1866, 42 U.S.C. § 1981.

83.

Dr. Madison requests that the Court award damages and equitable relief against Defendants and for Dr. Madison in an amount to be determined by evidence offered at trial of this matter.

# COUNT THREE

## EQUAL PROTECTION UNDER THE 14TH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
*Against all Defendants and against defendants in their individual capacity pursuant to 42. U.S.C. § 1983.*

84.

Plaintiff now fully incorporates the facts and assertions found in paragraphs 18, 30, 35-42, 43, 44-52, and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Count.

85.

For the reasons set forth under Count Three, above, Defendants have further violated Dr. Madison's rights under the Equal Protection Clause of the 14th Amendment to the Constitution of the United States.

86.

The actions of Defendants were committed intentionally and with deliberate indifference to Dr. Madison's constitutional rights and caused him significant financial loss and emotional distress.

87.

As a direct, legal, and proximate result of the Defendants' violations of Dr. Madison's constitutional rights, Dr. Madison has been injured in an amount to be proven at trial.

88.

Defendants, acting under color of statute, ordinance, regulation, and with a policy, custom, or usage of allowing, abetting, and perpetrating racial discrimination, subjected Dr. Madison to, or caused him to be subjected to, the deprivation of rights, privileges, or immunities secured by the Equal Protection Clause of the 14th Amendment to the Constitution of the United States, by and through 42 U.S.C. § 1983.

89.

Defendants are liable to Dr. Madison for all damages arising from their collective and individual conduct violating Dr. Madison's constitutional rights for which Dr. Madison requests that the Court award damages and equitable relief against Defendants and for Dr. Madison in an amount to be determined by evidence offered at trial of this matter.

### COUNT FOUR

### VIOLATION OF GEORGIA OPEN RECORDS ACT
### O.C.G.A. §50-18-70 et seq.
*Against Defendant Colquitt County School District.*

90.

Plaintiff now fully incorporates the facts and assertions found in paragraphs 53-62, and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Count.

35

91.

Under Georgia law, agencies shall produce for inspection all records responsive to a request within a reasonable amount of time not to exceed **three business days** of receipt of a request. O.C.G.A. § 50-18-71.

92.

Plaintiff requested open records from Defendant Colquitt County School District on April 12, 2021. To date, no documents have been produced, nor an explanation been given as to the delay.

93.

Plaintiff requires these records and seeks the Court to enjoin Defendant Colquitt County School District to comply with the Georgia Open Records Act by producing these records and any other records she will subsequently request as is his right under Georgia law.

## COUNT FIVE

## DEFAMATION
*Against all Defendants, including in their individual and official capacity.*

94.

Plaintiff now fully incorporates the facts and assertions found in paragraphs 38-42, and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Count.

95.

Defendants made false statements concerning Dr. Madison, harming his reputation, injuring his trade, office, and profession.

## ATTORNEY FEES

96.

Plaintiff is entitled to an award of costs, attorney's fees, and litigation expenses pursuant to all applicable laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

(a)    Take jurisdiction of this matter and declare that Dr. Madison's rights under the statutes set forth above were violated by Defendants;

(b)    Permanently enjoin the Defendants from further discriminating against Dr. Madison because of his race and reinstate him to his position;

(c)    Award Dr. Madison compensatory damages, including without limitation, all emotional distress damages, pain and suffering, loss of professional reputation, back pay, benefits, and other losses incurred as a result of Defendants' unlawful discrimination;

(d)    Order the Defendants to award front pay, as just, equitable and appropriate;

(e)    Award Dr. Madison pre-judgment and post-judgment interest;

(f)    Award Dr. Madison costs and expenses of this action, including reasonable attorney fees as authorized by law;

(g)    Grant a trial by jury;

(h)    Award such other and further legal and equitable relief as will effectuate the purposes of the referenced statutes or as the Court deems just and proper;

Respectfully submitted this 20th day of March 2023,

**WILLIAMS OINONEN LLC**

/s/ JULIE OINONEN
Julie Oinonen (Ga. Bar No. 722018)
*Counsel for Plaintiff*

44 Broad Street, NW, Suite 200
Atlanta, Georgia 30303
(404) 654-0288/ (404) 592-6225 FAX
julie@goodgeorgialawyer.com